IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 4, 2021 Session

## STATE OF TENNESSEE v. LAVONTE LAMAR DOUGLAS

**Appeal from the Circuit Court for Hardeman County**
**No. 19-CR-103      J. Weber McCraw, Judge**

_____

### No. W2020-01012-CCA-R3-CD

_____

The Defendant, LaVonte Lamar Douglas,[1] appeals as of right from his convictions for first degree felony murder and attempted aggravated robbery, for which the trial court imposed an effective sentence of life imprisonment. The Defendant argues that (1) the evidence was insufficient to support his convictions because his involvement was based upon uncorroborated accomplice testimony and no direct evidence linked him to the offenses; (2) his right to confront a witness was violated when a police witness referenced a nontestifying co-defendant's statement; and (3) his mandatory life sentence is unconstitutional in light of his status as a juvenile at the time of the offenses. After a thorough review of the record and applicable law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and JILL BARTEE AYERS, J., joined.

Valerie T. Corder (in reply brief and at oral argument) and Josie S. Holland (in reply brief), Memphis, Tennessee; and A. Blake Neill (at trial and in appellate brief), Somerville, Tennessee, for the appellant, LaVonte Lamar Douglas.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry (at oral argument) and Renee W. Turner (in appellate brief), Senior Assistant Attorneys General; Mark E. Davidson, District Attorney General; and Joe L. VanDyke and Falen Chandler, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

---

[1] In various portions of the record, including the first indictment and several filings by defense counsel, the Defendant's first name was spelled "Lavonta," "Lovonta," "LaVonta," and "Lavonte." Our review of the record indicates that the correct spelling is LaVonte.

This case arises from a March 20, 2018 incident in which the Defendant,[2] Javon Blakemore, John Gray, and Taylor Robinson planned and attempted a robbery of El Ranchito restaurant ("El Ranchito") in Bolivar, Tennessee. Co-defendants Gray and Robinson were El Ranchito employees. The Defendant and co-defendant Blakemore entered the restaurant while co-defendants Gray and Robinson waited nearby in co-defendant Gray's white Buick LeSabre sedan. During the attempted robbery, the Defendant fatally shot nineteen-year-old Michael Ruiz. The Defendant was seventeen years old at the time of the incident.

The September 2018 term of the Hardeman County Grand Jury indicted all four co-defendants for attempted aggravated robbery, a Class C felony, and first degree felony murder, a Class A felony. See Tenn. Code Ann. §§ 39-13-202, -13-402. In May 2019, a second indictment charged the Defendant separately with the same offenses; however, because the original indictment had been dismissed, the trial court remanded the case to the juvenile court and filed corresponding judgments indicating that the second set of indictments had been dismissed as nolle prosequi. On July 26, 2019, the juvenile court transferred the Defendant's case to circuit court. In September 2019, a third indictment was filed charging the Defendant with the same offenses. The trial court consolidated the file for all three cases into case number 19-CR-103 by an agreed order.

At trial, El Ranchito owner Maria Howell, Ms. Howell's daughter Audrey Howell,[3] and employee Francisco Rodriquez testified about the robbery. On March 20, 2018, around closing time, Ms. Howell was in the restaurant's office. Mr. Rodriquez was working in the kitchen with Ms. Howell's sister-in-law Jazmin Martinez and the victim, who was Ms. Howell's nephew. Audrey was inside the employee restroom.

Mr. Rodriquez testified that he saw the back door open and that a man entered, who approached "the cook"[4] and demanded money. The man then approached Mr. Rodriquez, pulled out a small gun, and said, "Give me the money – give me the money. I will kill you. Give me the money." Mr. Rodriquez opined that the man knew "something" because Mr. Rodriquez and the cook typically kept cash in the evenings. He noted that the man resembled one or two El Ranchito employees and seemed nervous. Mr. Rodriquez described the man as a "little guy" who wore a hooded sweatshirt, blue jeans, and tennis shoes.

---

[2] The Defendant was tried separately, and at the time of his trial, co-defendant Blakemore had entered a guilty plea to second degree murder.

[3] Because Maria Howell and Audrey Howell share a surname, we will refer to Audrey by her first name for clarity. We intend no disrespect.

[4] Mr. Rodriquez appeared to be referring to Ms. Martinez.

- 2 -

Mr. Rodriquez told the man that he had no money but that he would retrieve money from the cash register. Mr. Rodriquez walked away from the man toward the register before running through a door into the kitchen. Meanwhile, Ms. Howell heard "noise and voices that didn't belong there" and walked to the office door to investigate. She saw a young Black man walking from the kitchen area with a gun, and she returned to the office to retrieve her own gun. Ms. Howell, Mr. Rodriquez, and Audrey all heard a gunshot and saw the victim on the floor after the robbers fled. Audrey called 911 from inside the restroom. Ms. Howell noted that the victim complied with the robbers' demands.

Ms. Howell affirmed that El Ranchito had surveillance cameras that recorded the incident from multiple angles. The recordings, which were received as an exhibit and did not contain audio, reflected that two men walked across the back parking lot of El Ranchito and entered through a back door. One man, who was later identified as co-defendant Blakemore, wore a black sweatshirt and white shoes and held a handgun in his right hand. The other man, who was later identified as the Defendant, held a rifle and wore a black shirt, black shoes, and black pants with a white horizontal stripe on the upper left thigh. The manner in which the Defendant held the rifle reflected that he pulled the trigger with his left hand.

The recordings reflected that after entering the kitchen, co-defendant Blakemore turned to his right, looked over his shoulder at the Defendant, and pointed to their left. The Defendant walked to the left toward the dishwashing area. Co-defendant Blakemore walked to his right, pointed his handgun at a woman in a green shirt, who was identified as Ms. Martinez, and walked toward a man wearing a white shirt, who was identified as Mr. Rodriquez. Mr. Rodriquez gestured toward an area behind co-defendant Blakemore; when co-defendant Blakemore turned, Mr. Rodriquez ran out of the camera frame. Simultaneously, Ms. Howell was briefly visible walking into a doorway behind co-defendant Blakemore and quickly ducking back inside the office.

While the events involving co-defendant Blakemore occurred, the Defendant walked into the dishwashing area and pointed his rifle at the victim, who was wearing headphones connected to his cell phone. When the victim saw the Defendant, he held up his hands, slowly removed his headphones, set his cell phone on the counter, and stood facing the Defendant with his hands still raised. The Defendant came closer to the victim and shot him in the left upper chest. The victim clutched his chest and walked forward before collapsing onto his side; blood was visible dripping onto the floor. Meanwhile, co-defendant Blakemore had run to the back door and gestured toward where the Defendant stood, and both of them fled the building and ran in the direction from which they came.

In the 911 recording, Audrey stated that she thought she heard a gunshot, and a woman's screaming was audible in the background. Another person, whom Audrey

identified as Ms. Howell, began speaking to the operator and stated that her nephew had been shot.[5]  On cross-examination, Audrey acknowledged her April 6, 2018 written police statement and recalled that a person named Tacyvin Douglas[6] called El Ranchito earlier in the day.  At the time, she did not consider the call to be suspicious.

Former Bolivar Chief of Police Pat Baker testified that he arrived at the crime scene as medical personnel were "working on" the victim in an ambulance.  Chief Baker stated that as a result of information co-defendant Blakemore gave during his subsequent police statement, he was able to identify co-defendant Blakemore in the El Ranchito surveillance recording.  Chief Baker noted that in the recording, co-defendant Blakemore was holding a handgun and wearing white tennis shoes and a hooded sweatshirt[7] with a "white emblem" on the left chest.  Chief Baker identified the Defendant in the recording as the man holding the rifle in a "left-handed stance."  He agreed that the robbers fled toward a nearby subdivision.  According to Chief Baker, a resident of the subdivision reported seeing a white Buick leave the area.

Chief Baker testified that the morning after the incident, he sent an officer to speak with Bolivar Central High School (BCHS) principal Jeff Barnes.  Mr. Barnes told the officer that one of his students, Brentarrious Holmes,[8] had a white car, and officers later conducted a traffic stop of Mr. Holmes and took him to the police station.  Mr. Holmes, whose nickname was "Frog," told officers that he gave co-defendant Blakemore and the Defendant a ride the previous night and that co-defendant Blakemore admitted to Mr. Holmes that "they" had robbed El Ranchito and shot the victim.

Chief Baker testified that the police also interviewed co-defendant Blakemore, who stated that he and the Defendant entered El Ranchito, that co-defendant Blakemore held the employees at gunpoint, that the Defendant had a rifle and shot the victim, and that co-defendant Blakemore and the Defendant went to the nearby subdivision and got into co-defendant Gray's car.  Chief Baker stated that co-defendant Blakemore was "nervous,

_____

[5] The remainder of the call was difficult to understand; multiple distressed people were crying and speaking simultaneously in the background, and the dispatcher was communicating with officers continuously in the recording.

[6] The record reflects that Tacyvin and the Defendant were not related.  Because they share a surname, we will refer to Tacyvin by his first name for clarity.  We intend no disrespect.

[7] Chief Baker described the sweatshirt as white, but the surveillance recording reflected that it was black.

[8] Chief Baker stated during his direct examination that Mr. Barnes named co-defendant Gray and that officers stopped and interviewed co-defendant Gray.  However, he later clarified that he meant to refer to Mr. Holmes.

acting confused, [and] didn't really want to cooperate and give the names. He was dodging the questions." Chief Baker said that he determined co-defendant Blakemore was not being truthful. Coincidentally, at that moment during co-defendant Blakemore's interview, Chief Baker received a text message. Chief Baker took the opportunity to look at his cell phone and began gathering his notes; he told co-defendant Blakemore that the police "didn't need him anymore, that [they] just recovered the guns."[9] As Chief Baker was leaving, co-defendant Blakemore expressed his desire to "tell [him] the truth." Chief Baker briefly left the interrogation room, and when he returned, co-defendant Blakemore was telling a juvenile officer and Bolivar Police Department (BPD) Officer Chris Burkeen "how it had happened." Chief Baker recorded the statement, which implicated the Defendant and co-defendant Gray. He denied that he offered co-defendant Blakemore anything for his statement.

Chief Baker testified that he did not make a crime scene log for El Ranchito and that to his knowledge, no witness statements were taken at the scene. He stated that because the murder was recorded, it "was actually a unique case." Chief Baker noted that none of the employees recognized the robbers, and he told them to go home and write down any details they remembered. He also told them that the police would contact them later to take written statements. The following day, the BPD arrested the Defendant, co-defendant Blakemore, and co-defendant Gray. Chief Baker stated that the Tennessee Bureau of Investigation (TBI) later discovered a fourth suspect.

On cross-examination, Chief Baker testified that prior to his retirement, he worked in law enforcement for thirty-one years. Chief Baker could not recall any person he knew who shot a gun using his non-dominant hand, although he was "sure there [were]" such people. Chief Baker acknowledged that the robbers did not wear gloves and that they touched the back doorknob; he said, however, that the door was open and that the handle was wet due to the weather, which he described as a "real hard mist." He stated that it was impossible to collect fingerprints from a wet surface because the powder used in fingerprint testing "clump[ed] up." He acknowledged that the police did not follow up with the eyewitnesses after the night of the robbery. Chief Baker denied declining help from the Hardeman County Sheriff's Office (HCSO). He stated that during his eight years as the BPD chief, he investigated between ten and twelve murders. He averred that all of the investigations were handled without help from the HCSO or the TBI. Chief Baker clarified that he was referring to "investigating the case, actually hitting the street, taking the statements, and doing the charges[.]" He added that before he was chief, he recalled one instance in which a TBI blood spatter expert was consulted; likewise, he acknowledged the possibility that he asked the HCSO to check an address or a vehicle registration. Chief

---

[9] It was clear contextually that Chief Baker fabricated the statement as an interrogation technique; multiple witnesses testified that the guns used in the robbery were never recovered.

Baker noted that the State obtained convictions in all the murder cases he investigated aside from one in which the jury found that the defendant acted in self-defense.

Chief Baker testified that co-defendant Blakemore's police statement reflected that he "was picked up on Marvin Street," which was a dead-end street near El Ranchito, and that Officer Burkeen found a box of Black and Mild cigarillos (Black and Milds) in that area. Chief Baker thought that Officer Burkeen placed the Black and Milds into evidence, although to his knowledge no further testing was performed on them. He noted that they also would have been wet due to the weather. Chief Baker was not aware of a method to "run . . . the SKU number" to determine the store at which the Black and Milds were purchased.

Chief Baker testified that the day after the robbery, he interviewed co-defendant Blakemore and Officer Shane Swift interviewed co-defendant Gray. Chief Baker clarified that although co-defendant Gray "was associated with" a white Buick, the person the police stopped and took to the police station the morning after the robbery was Mr. Holmes, who also drove a white Buick. Chief Baker did not recall telling Officer Burkeen to bring Mr. Holmes, Tacyvin Douglas, and co-defendant Gray from school to the police department, although he said if Officer Burkeen included this fact in a written report, he had no reason to doubt its veracity.

Chief Baker testified that he interviewed Mr. Holmes at the police station. Mr. Holmes told Chief Baker that he picked up co-defendant Blakemore and the Defendant the previous night and that after he dropped off the Defendant, co-defendant Blakemore acted upset, hit "the back of the seat," and admitted to shooting the victim. Mr. Holmes also relayed that the murder weapon had been taken to the home of Jonathan Geanes, whose nickname was "Shotgun." Chief Baker stated that Mr. Geanes evaded the police for a period of time, that the police surveilled Mr. Geanes's mother's house for a couple of days, that they eventually searched the house twice pursuant to a search warrant, and that the murder weapon was never recovered.

Chief Baker testified that they chose not to search the co-defendants' houses immediately after the robbery because the guns were alleged to have been in Mr. Geanes's possession and because the clothing worn by the robbers "pretty much matched what everybody wears on the street every day, black clothes, black hood, black ski masks." Chief Baker noted that at some point later in the investigation, officers searched the co-defendants' houses. The police recovered a purple bandana and a black wool cap from co-defendant Gray's house; Chief Baker noted that co-defendant Gray had entered a guilty plea. Chief Baker stated that the bandana and cap were never DNA tested, and he noted that no DNA testing was performed in this case because no DNA evidence was recovered

at the crime scene. Similarly, co-defendant Gray's car was not tested for blood or gunpowder residue.

Chief Baker testified that he never suspected that Mr. Holmes was involved in the robbery because co-defendant Blakemore corroborated the Defendant's presence in Mr. Holmes's car that evening. He stated that co-defendant Blakemore relayed that the Defendant was the shooter and that during his police interview, co-defendant Blakemore was wearing the same white tennis shoes depicted on the surveillance recording. The police collected the shoes as evidence. Chief Baker said that after co-defendant Blakemore gave his statement, the police continued to search for the rifle and Mr. Geanes. Co-defendant Blakemore's attorney also contacted Chief Baker and told him that "there was a lot more to the story than [Chief Baker] was told previously and that [co-defendant Blakemore] wanted to cooperate one hundred percent." Co-defendant Blakemore returned to the police station two or three weeks later, and TBI and HCSO officers took him "around to every place and every stop that he did . . . that night," during which co-defendant Blakemore implicated a fourth person, co-defendant Robinson. Chief Baker stated that the police were able to conclude their investigation after co-defendant Blakemore gave "one hundred percent detail of what happened[.]"

Chief Baker repeatedly disagreed that the BPD stopped its investigation after co-defendant Blakemore gave his initial statement. He noted that the BPD offered a ten thousand dollar reward to anyone who could produce the gun used in the murder. Chief Baker did not remember an individual named Tacyvin Douglas, and he stated that he did not interview him. Likewise, Chief Baker did not recall Officer Burkeen's report that Tacyvin was friends with co-defendant Robinson, co-defendant Blakemore, and Mr. Holmes. Chief Baker stated that he may have spoken to Tacyvin and that if Tacyvin had important information, Chief Baker would have taken a written statement from him. Chief Baker did not remember Officer Burkeen's conversation with a person named Luis Chaviriz.

Chief Baker testified that two weeks after the robbery, the TBI and HCSO were "put on lead on the case with [the BPD] assisting." He affirmed that in the twenty-eight years he had worked for the BPD, this was "totally unheard of," but he maintained that the BPD was diligently investigating the case during that time.

Chief Baker testified that Raines East Apartments (Raines East) was located near El Ranchito, that it was a newer apartment complex, and that no security footage from the time of the robbery was available because the cameras there did not function. Chief Baker noted that a former officer worked part-time as a manager at Raines East and that the officer and another manager had previously informed the police department multiple times that the security cameras did not function. Chief Baker went to Raines East eight or nine days

after the robbery to inquire about the surveillance cameras; he acknowledged that some security cameras recorded over existing footage, but he stated that he was not concerned "about that."

Chief Baker testified that he had never investigated a gang-related case. He stated that in the Defendant's case, the gang membership of some of the individuals involved "never came up" and that he never asked "that question." On redirect examination, Chief Baker testified that co-defendant Gray had entered a guilty plea and that this was "a pretty good indication that it might have been his car." Chief Baker stated that Mr. Holmes conveyed that he picked up two individuals at Raines East.

BPD Officer Shane Swift testified that he processed the crime scene and that he collected a shell casing from the kitchen. He noted that bullet fragments were recovered from a ceramic tile wall at El Ranchito at a later date because a construction crew was required to extract them. Officer Swift also interviewed co-defendant Gray, who initially admitted "[v]ery little involvement" but eventually entered a guilty plea. Co-defendant Gray told him that a gun had been in his car, and Investigator Futtrell "checked the car." Officer Swift identified items of clothing that were collected from co-defendant Gray's house, which were a black toboggan, a purple bandana, and a hooded sweatshirt with a "Nike logo" on the left front chest. He also collected a pair of white "Nike Air Force Ones" from co-defendant Blakemore. Officer Swift opined that the clothing he collected corresponded to the clothing worn by the person who was not the shooter in the El Ranchito surveillance recording.

On cross-examination, Officer Swift acknowledged that no physical evidence connected the Defendant with the incident. He did not recall whether it was evident in the surveillance recording if the perpetrators were wearing gloves during the robbery. To his recollection, no fingerprints were collected, although he did not remember why. Officer Swift thought that the shell casing was sent for testing; he noted, though, that the shell casing was found on a wet portion of the kitchen floor. He stated that some of the El Ranchito employees gave written statements, although he did not remember when they gave the statements. Officer Swift said that he worked at the BPD for nineteen years, that he worked on more than ten murder cases, and that sometimes the HCSO and the TBI assisted, although he did not recall any specific examples of such cases. He was an investigator on three or four murder cases with the BPD. Officer Swift stated that it was the Chief's job to call in other agencies for help. Officer Swift said that another officer took co-defendant Blakemore's statement and that he recalled very little about the statement. Officer Swift averred that he met with the district attorney's office in advance of trial to discuss the case, but he did not review the entire case file before his testimony because he no longer worked for the BPD.

- 8 -

Relative to Tacyvin, Officer Swift testified that he remembered the name and that he was "sure somebody talked to him" at the police station because they would not "bring him up there" without talking to him. He was not aware that co-defendant Gray pled no contest to second degree murder in this case.[10] He did not recall co-defendant Gray's stating that he was "worried that Tacyvin Douglas was the one who turned him in" to the police. Officer Swift agreed that he told co-defendant Gray that he would check the surveillance footage at Raines East; he noted that Chief Baker went to the apartment complex alone. Officer Swift stated that he and other officers drove through Bolivar in search of surveillance cameras. He did not know whether the clothing recovered at co-defendant Gray's house was ever DNA tested. He stated that Investigator Futtrell searched co-defendant Gray's vehicle; he did not know whether the car was ever tested for blood stains or gunpowder residue. Officer Swift acknowledged that co-defendant Gray's house was searched three days after the robbery; he stated that the timing of the search depended on "when they bec[ame] suspects, what was said, . . . what order it became important." He was not involved in the search of Mr. Geanes's home.

Officer Swift testified that he interviewed the Defendant and that the Defendant "didn't say much of anything." The Defendant admitted that Mr. Holmes and co-defendant Blakemore picked him up in a white Buick sedan and that he rode to Whiteville with them, but he denied being involved in the robbery. Officer Swift stated that he searched co-defendant Blakemore's home, although he did not recall when this occurred. He noted that the police went there once without conducting a search and that the TBI accompanied officers there at a later date to collect clothing. He denied that after co-defendant Blakemore gave his statement, the BPD stopped its investigation. When asked what else he did to investigate, Officer Swift said, "I'd have to look at the files and my notes and I don't have those up here." Officer Swift stated that in order to corroborate co-defendant Blakemore's police statement, he interviewed witnesses and "looked for videos," although he could not remember who he interviewed. When asked whether his interviews provided corroboration for co-defendant Blakemore's statement, Officer Swift responded that he did not remember.

BPD Officer Chris Burkeen testified that on the evening of the robbery, he photographed the victim's body at the hospital and that around 1:30 a.m., he and another officer searched the area between El Ranchito and Marvin Road. They found an unopened box of Black and Milds "right at the end of Marvin Road[.]" Officer Burkeen noted that the plastic wrapper had "no condensation, no nothing on it." He collected the Black and Milds as evidence, but he did not know whether the package was tested for fingerprints. He explained that although he was an investigator at the time of trial, he was a patrol sergeant at the time of the incident and that he did not order evidence testing.

---

[10] The record reflects that co-defendant Gray entered such a plea.

Officer Burkeen testified that while he was at the crime scene, he saw Mr. Barnes, who came to offer support to the victim's family. Officer Burkeen went to BCHS later that morning and spoke to Mr. Barnes and an assistant principal. Mr. Barnes asked Officer Burkeen if the police had any leads other than a white Buick having been seen in the area. When Officer Burkeen mentioned the Black and Milds, Mr. Barnes relayed that some days prior, Tacyvin, co-defendant Robinson, and Mr. Holmes came to school smelling like marijuana and that Mr. Barnes searched them. Although Mr. Barnes found no marijuana, he found and confiscated several packs of Black and Milds. Mr. Barnes also told him that Mr. Holmes and co-defendant Gray drove white Buicks and that co-defendant Gray worked at El Ranchito.

Officer Burkeen testified that officers brought Tacyvin, co-defendant Gray, and Mr. Holmes to the police station for questioning. Chief Baker interviewed Mr. Holmes and told Officer Burkeen that Mr. Holmes was "talking." Mr. Holmes asserted that he picked up the Defendant and co-defendant Blakemore at Raines East and drove them to Whiteville. According to Mr. Holmes, co-defendant Blakemore was "visibly upset," hit one of the car seats, and said, "We shot Big Mike. We shot Big Mike." Officer Burkeen stated that no evidence indicated that Tacyvin was involved in the robbery.

On cross-examination, Officer Burkeen testified that although he had "heard of" right-handed individuals shooting left-handed, he was not "familiar with it." He did not recall whether it rained the night of the robbery. Officer Burkeen stated that he was not "in investigations" at the time of his involvement in this case, but that generally, he would have checked the Black and Milds for fingerprints. Officer Burkeen stated that Mr. Barnes also informed him of a gas station robbery in Whiteville prior to the El Ranchito robbery. He was unsure whether Black and Milds were taken during the Whiteville robbery.

Officer Burkeen testified that Mr. Barnes told him that Tacyvin, Mr. Holmes, and co-defendants Gray and Robinson spent time together. Officer Burkeen denied investigating any "gang relations" between the suspects, but he noted that he "was just out of the loop on a lot of it." He agreed that Mr. Barnes never mentioned the Defendant and that the Defendant was not a BCHS student at the time of the robbery. Mr. Barnes told Officer Burkeen that Tacyvin and co-defendant Gray arrived late to school the morning after the robbery and that Tacyvin "acted like he didn't know about the murder."

Officer Burkeen testified that he sent a photograph of Mr. Holmes's car to Luis Chaviriz, an El Ranchito employee. Mr. Chaviriz reported to Officer Burkeen that on the Sunday before the shooting,[11] he saw a "suspicious white car . . . in the back parking lot of El Ranchito[.]" Mr. Chaviriz approached the car, but it "sped off." Mr. Chaviriz confirmed

---

[11] The shooting occurred on a Tuesday night.

that co-defendant Gray's car was similar to the one he saw. Officer Burkeen acknowledged that Mr. Chaviriz never gave a written statement. When asked whether the police tried to obtain surveillance footage of the back parking lot at El Ranchito, Officer Burkeen reiterated that although he would generally have attempted to do such, he was not an investigator at that point in time. He stated that he relayed his conversation with Mr. Chaviriz to Chief Baker and Officer Swift.

Officer Burkeen testified that two days after the robbery, he prepared a search warrant for Mr. Geanes's house upon request from Officer Swift, who was at the house. He agreed that no weapons were found there. Officer Burkeen stated that other officers searched co-defendant Gray's house, that no one searched co-defendant Blakemore's house, and that he did not search the Defendant's house. When asked whether any officers interviewed Tacyvin during his time at the police station, Officer Burkeen responded that he knew Tacyvin was "in the back with" an investigator and Officer Swift, but he did not know whether anyone interviewed Tacyvin.

Mr. Barnes testified that at the time of the El Ranchito robbery, he was principal of BCHS. After his daughter told him that the victim had been killed, Mr. Barnes went to the crime scene because he could not sleep, and he noted that he was "nosy" and wanted to see if there was "anything [he] could do." Mr. Barnes stated that the victim was a "good kid." While at the crime scene, Mr. Barnes spoke to some of his former students and the victim's uncles. He overheard a conversation between Chief Baker and Ms. Howell about a white Buick. The following morning, Officer Burkeen came to BCHS and told Mr. Barnes about having found a pack of Black and Milds. Mr. Barnes testified consistently with Officer Burkeen regarding the incident in which he confiscated Black and Milds from Tacyvin, co-defendant Robinson, and co-defendant Gray, although Mr. Barnes estimated that the incident occurred a couple of weeks before the robbery. Mr. Barnes noted that he could not search co-defendant Gray's Buick during the previous incident because it was parked off school property. He stated that Mr. Holmes drove an "identical" white Buick.

Mr. Barnes testified that the police asked him to watch surveillance footage from a gas station in Whiteville on the night of the robbery. The recording was played in court, and Mr. Barnes identified Mr. Holmes, co-defendant Blakemore, the Defendant, and Cameron Boyle, who were all traveling in Mr. Holmes's white Buick sedan.

On cross-examination, Mr. Barnes testified that although the Defendant was not a BCHS student at the time of the robbery, he had previously been a student and that the other three young men in the recording were students at the time of the robbery. He affirmed that he could identify each person in the recording on sight, and he noted that the Defendant "had a walk" he recognized in the recording.

Mr. Barnes agreed that he identified Tacyvin to Officer Burkeen as one of the students involved in the Black and Milds incident. Because Tacyvin was a minor at that time, the school called his mother. Tacyvin stayed in the office with Mr. Barnes until she arrived, and she accompanied Tacyvin to the police station. When asked how tall Tacyvin was, Mr. Barnes responded that he did not know, but he estimated about five feet, nine or ten inches tall, which was about Mr. Barnes's height. He said, though, that if a juvenile arrest record indicated that Tacyvin was six feet tall, he would not dispute that measurement.

Mr. Barnes testified that he was aware of his students' gang affiliations. He affirmed that co-defendant Blakemore, co-defendant Blakemore's brother Jaquan,[12] and co-defendant Robinson were members of the Vice Lords. He did not know whether co-defendant Gray, Mr. Geanes, or the Defendant were gang members. Mr. Barnes noted that co-defendant Gray transferred schools in eleventh grade before returning in twelfth grade, that Mr. Geanes was not a BCHS student, and that he had not seen the Defendant since he was expelled in January 2016.

Former Whiteville Police Chief Steven Stanley testified that in April 2018, the Hardeman County District Attorney's Office asked him to help investigate the El Ranchito robbery, along with the HCSO and the TBI. Chief Stanley noted that he was "the tech guy" and reviewed text messages, video recordings, and photographs. On April 5, 2018, Chief Stanley collected surveillance footage from a Shell gas station in Whiteville. The surveillance recording was received as an exhibit and showed a white sedan arriving at a gas pump. Two men exited the from the front seats of the vehicle and walked off screen. After a short time, a third man exited the passenger-side back seat and began to pump gas; he wore a white t-shirt, black shorts, and white tennis shoes. A fourth man exited the driver's-side back seat and walked toward another gas pump; the man wore a white t-shirt and black pants with a white patch on the upper left thigh.

On cross-examination, Chief Stanley agreed that he had previously arrested Tacyvin for an incident unrelated to this case and that Tacyvin was six feet tall, as was noted in the juvenile court complaint. On redirect examination, Chief Stanley stated that he would have assessed Tacyvin's height by asking Tacyvin or looking at his identification.

TBI Special Agent Matt Pugh testified that he became involved in this case after the District Attorney's Office contacted the TBI on April 5, 2018. He noted that the TBI initially assisted in the investigation and later took "control of" it. Agent Pugh stated that it was unusual for the TBI to come into a case fifteen days after an incident, and he

---

[12] Because co-defendant Blakemore and Jaquan share a surname, we will refer to Jaquan by his first name for clarity. We intend no disrespect.

indicated that in rural counties, it was more common for local law enforcement to call the TBI immediately for assistance. He said that the BPD had three identified suspects—co-defendant Gray, co-defendant Blakemore, and the Defendant—had taken one written statement, and had obtained one confession. However, he said that the BPD had "no documentation, very little" and that "[a] lot of leg work needed to be done to shore up the case." Agent Pugh opined that the BPD had gathered enough evidence to charge the suspects, but not to convict them. He stated that TBI agents conducted new interviews of the suspects and witnesses, including obtaining an interpreter for some of the El Ranchito employees.

Agent Pugh testified that co-defendant Blakemore was interviewed again and gave a "full confession," including that co-defendant Robinson helped plan the robbery and provided the guns. Agent Pugh averred that co-defendant Blakemore initially failed to identify co-defendant Robinson because he was co-defendant Blakemore's cousin. Agent Pugh stated that he interviewed co-defendant Robinson several times and that he did not interview co-defendant Blakemore.

At this juncture, the following exchange occurred:

[THE STATE:] And was the information that you got from [co-defendant] Blakemore through his statements and the information you got from [co-defendant] Robinson –

[DEFENSE COUNSEL]: Your Honor, I would object at this point. If he's going to be discussing [co-defendant] Robinson's statements, [co-defendant] Robinson is not here for me to cross-examine or talk about any of the information he said.

THE COURT: Response?

[THE STATE]: I'm just asking if the information is consistent. I'm not asking what was said during the course of that interview.

THE COURT: All right. Why don't you rephrase your question to ask him if it was consistent?

. . . .

[THE STATE]: Was the information that you received from [co-defendant] Blakemore and the information you received from [co-defendant] Robinson consistent?

- 13 -

[AGENT PUGH]:  It was extremely consistent.

Agent Pugh identified co-defendant Blakemore and the Defendant in the El Ranchito surveillance recording.  He noted that the individuals fled toward an adjacent neighborhood.  He stated that in the recording, the Defendant carried the rifle in his left hand and had a white "reflective marker" on his pants.  Agent Pugh said that he saw the Defendant sign a property receipt with his left hand at the Memphis Juvenile Court.  He stated that although a right-handed person might "occasionally" shoot with his left hand, it did not occur often.

Agent Pugh testified that during the course of the investigation, he determined that the Defendant and co-defendant Blakemore fled from El Ranchito to Marvin Street, where a getaway car was waiting for them, and drove to Raines East where co-defendant Blakemore's brother and sister lived.  Agent Pugh stated that although the Raines East security camera did not function, "multiple witnesses put them there immediately" after the robbery.

According to Agent Pugh's investigation, after arriving at the apartment complex, Mr. Holmes picked up co-defendant Blakemore and the Defendant and drove them to Whiteville.  Agent Pugh noted that Mr. Holmes's Buick had a dent in the back passenger-side fender, which was visible in the Shell station surveillance recording.  Agent Pugh identified Mr. Holmes's car, Mr. Holmes, Mr. Boyle, co-defendant Blakemore, and the Defendant in the Shell station surveillance recording.  Agent Pugh noted that the Defendant was wearing a white t-shirt and the same black pants with a white patch that he wore during the attempted robbery of El Ranchito.  Agent Pugh identified booking photographs of the Defendant and co-defendant Blakemore, which reflected that the Defendant was six feet tall and that co-defendant Blakemore was five feet, eight or nine inches tall.

Agent Pugh testified that he was aware of Tacyvin from an unrelated investigation and that Tacyvin was "brought in" to the police department prior to the TBI's involvement in this case.  When asked whether any connection existed between Tacyvin and the El Ranchito robbery, Agent Pugh responded, "Not at all."  He acknowledged a booking photograph of Tacyvin that indicated he was five feet, eleven inches tall.

On cross-examination, Agent Pugh testified that in his experience as a firearms instructor, it was not as common for a right-handed person to shoot left-handed as it was for a left-handed person to shoot right-handed.  He stated that it was "very common" for the TBI to be called in to assist rural counties in homicide investigations.  Agent Pugh agreed that when the TBI took over this case, three suspects were in custody and that an additional suspect was added later.  He stated that the HCSO and the BPD continued to assist with the investigation.  Agent Pugh said that Chief Baker participated for several

days and that Agent Pugh "didn't see him after that." Agent Pugh denied that he "removed" Chief Baker from the case.

Agent Pugh testified that the two-week delay "[a]bsolutely" hindered his investigation. He specified that they never recovered the murder weapon and that the delay "slowed [the TBI] down a little bit" in obtaining witness statements and corroborating them. Agent Pugh stated that no DNA testing was ordered by the TBI, BPD, or HCSO. He agreed that the TBI and BPD did not order fingerprint testing, but he was uncertain whether the HCSO ordered fingerprint testing on the shell casing recovered at the crime scene. He noted that the HCSO submitted the shell casing to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to be added to a database and that the markings on the shell casing matched a gun that had been used in an unrelated crime. He further noted that it was "almost impossible to lift a fingerprint off of" a fired shell casing. He said, though, that if the ATF could "physically see a fingerprint" on a shell casing, they would attempt to collect it.

Agent Pugh testified that the black sweatshirt and purple bandana collected from co-defendant Gray's car matched co-defendant Blakemore's description of the clothing he wore during the robbery. Co-defendant Blakemore also identified the clothing as his during Agent Pugh's interview and stated that he "left them in the car." When asked why the BPD's evidence log indicated that the black hooded sweatshirt and purple bandana were collected at co-defendant Gray's home when they were, in fact, collected from co-defendant Gray's car, Agent Pugh responded that the clothing was recovered from the car when it was parked at co-defendant Gray's house. He acknowledged that the BPD did not seize the car on the day they arrested co-defendant Gray. Agent Pugh did not know if the car was driven between co-defendant Gray's arrest and when the TBI seized the car two weeks later. Agent Pugh had no explanation for why he did not test the Black and Milds for fingerprints. Relative to El Ranchito's back door, he stated that given the wet weather, lifting fingerprints would have been "pretty delicate," and he noted that even though the BPD could have tried to lift fingerprints after allowing the door to dry, water generally washed oil from a surface. He acknowledged that visible fingerprints could be photographed and that the door could have been sent to a laboratory for testing with "special chemicals."

Agent Pugh testified that he and another agent searched co-defendant Gray's car for fingerprints and bloodstains. He said that he did not test the car for gunpowder residue "[b]ecause of the time frame," explaining that in thirty years in law enforcement, he had "never seen a result ever come back positive on gunshot residue" because it was "fragile." Neither the BPD nor Agent Pugh searched the Defendant's home; however, Agent Pugh explained that the Defendant "lived from here to there" and that investigators were not certain where he lived. Agent Pugh said, though, that he ascertained that the Defendant

went to his grandmother's house in Whiteville on the night of the robbery, and Agent Pugh visited and searched that house. Agent Pugh did not recall seeing any cameras at Raines East other than the one near the entrance, and he directed another agent to investigate whether additional surveillance footage existed at the apartment complex.

Agent Pugh agreed that Ms. Howell's statement was the only one the BPD took. He stated that co-defendant Blakemore indicated in one of his interviews that he said the Defendant's first name out loud during the robbery. Agent Pugh was "sure" that the BPD asked the El Ranchito employees if they "heard or saw anything" during the robbery, but he did not know if any of the officers asked them if they heard co-defendant Blakemore refer to "LaVonte." Agent Pugh denied having heard that an employee saw a white car in the El Ranchito back parking lot before the robbery. Agent Pugh interviewed Mr. Holmes and opined that Mr. Holmes's account of events was truthful. Agent Pugh noted that Mr. Holmes was in another town such that it would have been implausible for him to have been near El Ranchito at the time of the murder. Agent Pugh stated that he did not interview Tacyvin about this case because there was "no need" and that Tacyvin was "never mentioned in this incident at all." Agent Pugh denied that Tacyvin's name appeared in the materials that the BPD provided the TBI about the investigation.

Agent Pugh testified that did not recall co-defendant Gray's statement in his police interview about his concern that Tacyvin turned him in to the police. Agent Pugh agreed that co-defendant Gray, who was a Crip gang member, was concerned that the Vice Lords "were setting him up" and that co-defendant Robinson, co-defendant Blakemore, Jaquan, and Mr. Geanes were all members of the Vice Lords. Agent Pugh noted that according to co-defendant Robinson, the Defendant had quit the Vice Lords but had still "been hanging out with the Vice Lords for about a year[.]" He agreed that in Mr. Holmes's initial statements, he indicated that after he dropped off the Defendant in Whiteville, co-defendant Blakemore "became frustrated, agitated," and when Mr. Holmes asked him what was wrong, co-defendant Blakemore said, "I shot Mike." Agent Pugh stated that when he interviewed Mr. Holmes, he sought to clarify Mr. Holmes's statement in two previous interviews that co-defendant Blakemore said he was the shooter. Agent Pugh noted that this account did not "fit the evidence that [they] had at the time." Agent Pugh testified that he "would hope" that he was not "leading" Mr. Holmes during the third interview.

Agent Pugh agreed that in his "extensive" experience with gang activity, gang members "[o]ccasionally" covered for one another by "tak[ing] a charge" or blamed people who were not gang members for offenses. Agent Pugh could not recall an instance in which gang members developed an agreed-upon story in advance, but he acknowledged that such a practice was possible. He stated that co-defendant Blakemore "wasn't telling the truth on everything, every single thing," explaining, "They all try to minimize their involvement at some point because . . . he was involved in a robbery that resulted in the

death of a young teenage man." He agreed that co-defendant Blakemore tried to minimize the involvement of other people; specifically, co-defendant Blakemore left out co-defendant Robinson, his cousin and fellow gang member, in order to protect him. Agent Pugh acknowledged the possibility that co-defendant Blakemore was trying to protect other unidentified people as well.

On redirect examination, Agent Pugh testified that if he were at El Ranchito on the night of the robbery, he would have considered the possibility of recovering fingerprints from the wet back door to be "[v]ery slim." He stated that the surveillance video indicated that the two robbers did not touch anything aside from the door and that there was nothing from which to collect fingerprints or DNA. Agent Pugh said that if a gun was not fired inside co-defendant Gray's car, "no chance" existed of finding gunshot residue in it.

Agent Pugh testified that at the time during the robbery when co-defendant Blakemore allegedly referred to the Defendant by name, Ms. Howell was not in close proximity, and two employees were preparing food. He stated that if he had interviewed Ms. Martinez, who spoke Spanish, he would have asked her generally if she could describe the robbers and whether she heard them say anything.

Agent Pugh clarified that Mr. Holmes was at home in Whiteville when co-defendant Blakemore called from Raines East and asked for a ride. He stated that co-defendant Gray entered a no contest plea and that the court found him "[g]uilty." Agent Pugh said that generally, in order to quit a gang, a person had to be beaten or "jumped out of the gang." He agreed that the Defendant had maintained his friendship with the co-defendants and spent time with them regularly. Agent Pugh acknowledged that people not in a gang sometimes covered for their friends and family members.

Agent Pugh testified that co-defendant Blakemore was represented by counsel when he made his initial police statements, and he denied that the State had made co-defendant Blakemore a plea offer at that time. Agent Pugh opined that co-defendant Blakemore had no motive to deceive the police without an offer from the State. The following exchange occurred:

Q. [Co-defendant Blakemore] has consistently named [the Defendant] as the shooter. How was that confirmed through the course of your investigation?

A. Well, through the course of the investigation it was confirmed through another co-defendant's statement which was Taylor Robinson –

[DEFENSE COUNSEL]: Your Honor, I object again to the introduction of [co-defendant] Robinson's statements.

- 17 -

THE COURT: I'll sustain that.

Agent Pugh testified that co-defendant Blakemore's identification of the Defendant was confirmed by a "videotape analysis," a "height chart" composed by the Federal Bureau of Investigation (FBI), the shooter's being left-handed, and "all the information" from co-defendant Blakemore about where they went after the robbery and with whom they spoke. Agent Pugh clarified that he interviewed Mr. Holmes because he was a "key" and "direct witness," and Agent Pugh wanted to corroborate the information in his previous statements and obtain more information about what exactly was said in the car. Mr. Holmes identified the Defendant as the shooter during the third interview. Agent Pugh denied that any evidence indicated that co-defendant Blakemore was the shooter. Agent Pugh affirmed that according to the surveillance recording, the person who was not the shooter wore the set of clothing co-defendant Blakemore identified as his. He also affirmed that the taller of the two individuals was the shooter and that according to their booking photographs, the Defendant was taller than co-defendant Blakemore. Agent Pugh agreed that guns had a "tendency to disappear" after a crime and that even if he had been involved in the investigation from the beginning, it was not certain that he would have recovered the guns.

On recross-examination, Agent Pugh acknowledged that Mr. Holmes consistently stated that the Defendant left the car before co-defendant Blakemore talked about the robbery. He opined that co-defendant Blakemore was not being deceitful during his interview. Agent Pugh stated that he would have let the El Ranchito door dry in an effort to test for fingerprints.

Co-defendant Blakemore testified that he was in prison stemming from his involvement in the El Ranchito robbery and the victim's murder. He agreed that he was one of the two robbers, and he said that "Douglas, Gray, and Robinson" were also involved with the robbery. Co-defendant Blakemore clarified that he referred to the Defendant, co-defendant Gray, and co-defendant Robinson.

Co-defendant Blakemore testified that he was at home when co-defendant Robinson called him and asked him to "go rob the restaurant." Co-defendant Blakemore went to a church parking lot behind his house and met the Defendant, co-defendant Robinson, and co-defendant Gray, who had all traveled there in co-defendant Gray's white car. Co-defendant Blakemore stated that in the car, they discussed that they would "just go in and get some money." He agreed that they used the term "hit a lick" to refer to committing a robbery. Co-defendant Blakemore did not recall who suggested El Ranchito as the target of the robbery, although he noted that co-defendants Robinson and Gray worked there and that they said money would be in the back of the restaurant at closing time. According to co-defendant Blakemore, it was decided that he and the Defendant would commit the robbery so that co-defendants Robinson and Gray would not be recognized. Co-defendant

- 18 -

Blakemore stated that a .380 pistol and a rifle were in the car when he entered it; he took the pistol, and the Defendant took the rifle. Co-defendant Blakemore stated that he wore a black jacket with a Nike logo, a bandana, and white Nike tennis shoes.

Co-defendant Blakemore testified that they drove to the back side of a store, where he and the Defendant exited the car. They walked across a field to El Ranchito and entered through the back door. Co-defendant Blakemore said that he entered first and walked to the right and that the Defendant entered behind him and walked to the left. Co-defendant Blakemore saw a man and a woman and demanded money, and the man walked toward the front of the restaurant. Co-defendant Blakemore averred that at this point, he thought that they needed to leave because the man would call the police. He agreed that he saw the victim to the left of the back door. As co-defendant Blakemore was running out of the restaurant, he said, "Bro, come on" and, "Vonte, come on." Co-defendant Blakemore heard a shot as he exited the back door.

Co-defendant Blakemore testified that they went through a field to Marvin Street, where co-defendants Gray and Robinson picked them up in the car. Co-defendant Blakemore changed clothes in the car and left the clothing there except for his tennis shoes, which he continued to wear; they also left the guns in the car. They traveled to Jaquan's girlfriend's apartment in Raines East, where they went inside for about ten minutes. Co-defendant Blakemore sent Mr. Holmes, who was in Bolivar, a text message, and Mr. Holmes picked up co-defendant Blakemore and the Defendant. Mr. Cameron was also in the car. They drove to a Shell gas station in Whiteville, then dropped off the Defendant at a house. Afterward, co-defendant Blakemore and Mr. Holmes went to a woman's house.

Co-defendant Blakemore testified that he told Mr. Holmes that he and the Defendant "went in to rob El Ranchito[.]" He denied telling Mr. Holmes that he shot the victim. The following day, Chief Baker interviewed him at the police station. Co-defendant Blakemore told Chief Baker that he, the Defendant, and co-defendant Gray were involved in the robbery. Co-defendant Blakemore agreed that he did not mention co-defendant Robinson because they were cousins. Co-defendant Blakemore was arrested and gave a second statement a month later to Chief Davis with the HCSO, which co-defendant Blakemore's appointed counsel attended and during which he implicated co-defendant Robinson and identified the Defendant as the shooter. He averred that he made both statements voluntarily and not in response to any offer from the State for leniency. Co-defendant Blakemore subsequently hired private counsel and pled guilty pursuant to a plea agreement. Co-defendant Blakemore agreed that he had consistently admitted his involvement in the robbery, identified co-defendant Gray as the driver, and identified the Defendant as the shooter. Co-defendant Blakemore stated that he knew Tacyvin and that Tacyvin had nothing to do with planning or executing the robbery. He reiterated that the Defendant was the shooter at El Ranchito.

- 19 -

On cross-examination, co-defendant Blakemore testified that he pled guilty to second degree murder and received an agreed-upon thirteen-year sentence. His plea agreement was conditioned upon his testimony in the Defendant's case. Co-defendant Blakemore stated that he did not know the Defendant and "was just with him." He stated that he spent time with co-defendant Robinson often and that he did not "hang out" with co-defendant Gray. He did not think it was odd that co-defendant Robinson asked him "to get in the car with the three of them[.]" He affirmed that co-defendant Robinson gave him and the Defendant clothing and guns before the robbery. Co-defendant Blakemore agreed that neither he nor the Defendant wore gloves. He further agreed that they did not obtain any money from the robbery. Co-defendant Blakemore said that he was nervous during the robbery and that he had never "done anything like that" before. He said that no one was "in charge" of the robbery, and he denied giving orders during it other than demanding money from the El Ranchito employees. He did not remember whether he directed the Defendant to go in a certain direction by pointing.

Co-defendant Blakemore testified that co-defendants Gray and Robinson told him where to meet them after the robbery. He stated that Jaquan was friendly with co-defendant Robinson, but not with co-defendant Gray and the Defendant. He did not recall whose idea it was to go to Jaquan's girlfriend's apartment. Co-defendant Blakemore agreed that Raines East contained multiple surveillance cameras.

Co-defendant Blakemore reiterated that Mr. Holmes was in Bolivar when he asked for a ride to Whiteville. He denied that he and Mr. Holmes picked up the Defendant on Tate Road[13] after leaving Raines East. He similarly denied knowing that the Defendant's mother lived near Tate Road, and he reiterated that he did not know the Defendant well.

Co-defendant Blakemore denied being a member of the Vice Lords. He stated that he did not know if Jaquan, Tacyvin, or co-defendant Robinson were members of the Vice Lords. He agreed that the Vice Lords' colors were red and black and that it was common for people who were not Vice Lords members to wear those colors. Co-defendant Blakemore identified a photograph of Jaquan, co-defendant Blakemore, and co-defendant Robinson, in which Jaquan wore a red and black coat, co-defendant Blakemore was pictured without a shirt, and co-defendant Robinson, who was also shirtless, held up a gun.

Co-defendant Blakemore testified that he did not speak to Jaquan on the day of co-defendant Blakemore's transfer hearing in juvenile court. He acknowledged that his initial statement to Chief Blake was untruthful and that he omitted co-defendant Robinson's involvement, claimed that he only carried a BB gun during the robbery, downplayed his role in the robbery, and said that co-defendant Gray took him home after the robbery

---

[13] It was apparent from the testimony that Tate Road was near Raines East.

instead of to Raines East. Co-defendant Blakemore agreed that he wanted to protect co-defendant Robinson, but he denied that he was afraid of "the fact that [co-defendant Robinson was] a high ranking gang member[.]" He averred that he was not protecting anyone else.

Mr. Holmes testified that on March 20, 2018, he was at home in Whiteville when co-defendant Blakemore called him and asked for a ride from Raines East. Mr. Boyle accompanied Mr. Holmes for the drive, and Mr. Holmes picked up co-defendant Blakemore and the Defendant. Mr. Holmes stated that he stopped at a Shell gas station in Whiteville before traveling to his cousin's house in "Fayette Corner." Mr. Holmes identified his white Buick LeSabre in the Shell station surveillance recording, as well as himself, Mr. Boyle, co-defendant Blakemore, and the Defendant. Mr. Holmes dropped off the Defendant at Fayette Corner and after a short interval, he, co-defendant Blakemore, and Mr. Boyle left. After they left, co-defendant Blakemore began punching the back of one of the seats and "broke down" before telling Mr. Holmes that "he pulled the trigger" at El Ranchito. Mr. Holmes reiterated that co-defendant Blakemore said, "I shot him." Mr. Holmes averred several times that he was certain that this was co-defendant Blakemore's statement. He agreed that if his previous statements indicated that co-defendant Blakemore said that "they" or "he" shot the victim, those statements were incorrect. Mr. Holmes admitted that he told Agent Pugh that co-defendant Blakemore said that "they" killed the victim. He affirmed that he was "confused" about co-defendant Blakemore's verbiage and that almost two years had passed since that evening. Mr. Holmes agreed that co-defendant Gray also drove a white Buick LeSabre and that Mr. Holmes's car had dents in the driver's side fender and by the gas tank on the passenger side. Mr. Holmes identified his car and co-defendant Gray's car in photographs.

On cross-examination, Mr. Holmes did not remember whether the Defendant entered his car at Raines East or at Tate Road near the apartment complex. He acknowledged that it was possible he picked up the Defendant on Tate Road. On redirect examination, Mr. Holmes acknowledged his police statements in March and April 2018 that he picked up the Defendant at Raines East. He agreed that his memory was better at that time than it was at trial.

Jaquan testified that he was co-defendant Blakemore's brother. On the night of the robbery around 9:00 p.m., co-defendant Blakemore came to Jaquan's girlfriend's apartment in Raines East with the Defendant and co-defendants Robinson and Gray. They stayed for about thirty minutes before co-defendants Robinson and Gray left together; co-defendant Blakemore and the Defendant went downstairs sometime later to meet Mr. Holmes. Jaquan stated that co-defendant Robinson was his cousin and that he knew the Defendant and co-defendant Gray. He estimated that he had known the Defendant for a couple of years and affirmed that he had no difficulty identifying him.

On cross-examination, Jaquan testified that every building at Raines East had a security camera. He denied talking to co-defendant Blakemore shortly after his arrest. Jaquan found out that co-defendant Blakemore had confessed later the next day at about 5:00 p.m. Before Jaquan gave his police statement on April 6, 2018, he learned the version of events co-defendant Blakemore told the police.

When asked whether he and co-defendant Blakemore were Vice Lords, Jaquan initially answered affirmatively, but he stopped and claimed that he thought defense counsel had asked if they were "Blakemore[s]." He then denied that he, co-defendant Blakemore, co-defendant Robinson, or the Defendant were Vice Lords.

FBI forensic examiner Anthony Imel, an expert in video forensics, testified that he was asked to determine the height of the two robbers as they appeared in the El Ranchito surveillance recording. Mr. Imel went to El Ranchito and placed height markers in the same location as the robbers in two still photographs taken from the surveillance recording of the incident, then superimposed the images such that he could determine the height of both men. Using this method, Mr. Imel concluded that the person who was had been identified as co-defendant Blakemore was five feet, nine inches tall, and that the person who shot the victim was six feet tall. On cross-examination, Mr. Imel noted that the measurements could be inexact because the men were wearing hats or head coverings. He estimated that the general margin of error was plus or minus one inch, depending upon the resolution of the image. He noted, though, that the "resolution imagery" for the image he used to determine the Defendant's high was ".18 inches." As a result, he had "no way to go beyond or lower than .18 inches[.]" Mr. Imel acknowledged that an individual's posture mattered in an image. He reiterated that "at this time in this image [the shooter was] six feet tall." Mr. Imel stated that height was a "class characteristic" and acknowledged that more than one person in Hardeman County could be about five feet, eleven inches or six feet tall.

On redirect examination, Mr. Imel clarified that the height calculated using the specific image of the shooter had a margin of error of plus or minus .18 inch. He agreed that both robbers wore hooded sweatshirts, and he noted that depending on the sweatshirt and how the hood was worn, it could fit closer to the person's head.

Acting Chief Medical Examiner Dr. Marco Ross, an expert in forensic pathology, testified that he had reviewed the victim's autopsy report, which was prepared by Dr. Kevin Jenkins of the Shelby County Medical Examiner's Office. According to the autopsy report, the victim sustained a gunshot wound to the left upper front chest. The bullet entered between the first and second ribs, perforated the left lung, heart, and two ribs, and exited through the left upper back. The report noted that internal bleeding was present, including blood aspirated into the lung tissue. The cause of death was the gunshot wound to the

chest, and the report noted no other health issues.  Dr. Ross identified autopsy photographs showing the entry wound, exit wound, and the victim's left lung after it was removed.

The Defendant presented the following proof after the close of the State's case. Lorraine Henkel, the regional property manager of Formidable Management Company, which managed Raines East, testified that each building in the complex had a surveillance camera.  A camera on each building captured the "breezeways" as well as some of the parking spaces near the building.  Generally, if a camera was not functioning, the assistant manager at the apartment complex would contact Ms. Henkel to authorize funds for repairs. Ms. Henkel was not aware of a recurring problem with the Raines East surveillance cameras between January and April of 2018.  To her knowledge, no issues existed with the cameras on March 20, 2018.  Ms. Henkel stated that normally, the camera footage was saved for two weeks, "but once the DVR start[ed] collecting too much memory, it chop[ped] itself down to about . . . four to three days."  She opined that this was "exactly what happened" at Raines East and that the cameras functioned as intended.

On cross-examination, Ms. Henkel testified that she knew the cameras were operable because she was "still able to log in and view the cameras" from her computer. She noted that even if a camera broke, "there's going to be at least four to five picking up the same information."  Ms. Henkel stated that if the onsite manager told police she did not have video footage, it would have been because the system had already recorded over the relevant time period.  Ms. Henkel said that at the time of the El Ranchito robbery, the system would have deleted footage in "like a three day" timeframe.

The Defendant recalled Chief Baker as a witness.  Chief Baker stated that although he knew he was still under subpoena, he did not ask the prosecutor to review the case file after his testimony during the State's case.  He noted that he testified "quite extensively" the day prior and that he had driven to court that day from Memphis after being informed around noon that the defense would recall him.  He said that although he did not remember the contents of the case file the previous day, he now recalled them.

Chief Baker testified that eight or nine days after the El Ranchito robbery, he went to Raines East to inquire about a surveillance recording.  When asked whether he was told the cameras were inoperable during the incident, Chief Baker responded, "[T]hey did not have footage."  Chief Baker disagreed that he testified previously that the cameras were inoperable.  He maintained that his previous testimony was that "there was no video footage."  He stated that the onsite manager told him "that the video footage was not recorded onsite, that it got uplinked to another state[.]"  According to Chief Baker, the manager told him that she would try to retrieve the recording and also gave Chief Baker a "passcode" for a website on which he could view the recording.  However, the manager and Chief Baker were unable to access the recording at the apartment office or the police

- 23 -

station. Chief Baker stated that after contacting the manager a second time, she conveyed that no recording existed. Chief Baker denied that the manager told him that if he had come to her within a day or two of the robbery, video footage would have been accessible. He similarly denied that the manager told him that the cameras functioned but recorded over stored recordings every three or four days. Chief Baker averred that the manager could give no explanation because "she [did not] work the cameras at the site." Chief Baker stated that he attempted to contact the out-of-state company that managed the surveillance recordings by using the passcode provided by the apartment manager to access their website. He said that the apartment manager spoke to the out-of-state company before telling him that no recording existed.

Chief Baker explained the delay in visiting the apartment complex manager by stating that the BPD was focused on recovering the murder weapon and finding the person who reportedly had it. He stated that the BPD had twenty or twenty-one officers at that time. When asked whether he could not "spare one officer" to retrieve the video evidence, Chief Baker responded that he had "picked up" a person who gave him information on who committed the offenses, that the identified person confessed, and that a third person involved "testified" to the same facts. Chief Baker stated, "In my mind people confessing to and giving the information of who [committed the offenses] is better than a video footage of a dark parking lot where we'd be arguing whether or not that is the defendant or not." He noted that the "point [was] moot" because "there was no[ footage] to be had so whether [he] went there and got it or not is a moot point[.]" He acknowledged that the day after the incident, co-defendant Blakemore had confessed, but co-defendant Gray and the Defendant either denied involvement or did not confess. He agreed that witnesses sometimes lied.

Chief Baker testified that Officer Burkeen "report[ed] to" him, but he also noted that Officer Burkeen had a "chain of command" of his sergeant, lieutenant, and captain. Chief Baker agreed that he permitted Officer Burkeen to go to BCHS and that Officer Burkeen called him to convey his conversation with Mr. Barnes, which led to the BPD's surveilling a white Buick in the school's parking lot. Chief Baker did not recall Officer Burkeen's having sent a photograph of the white Buick to Mr. Chaviriz. Chief Baker noted that he did not "think it was documented" and that if it was, he did not read it. Chief Baker acknowledged that he never followed up about "any potential video" of the El Ranchito back parking lot. He agreed that his initial visit to Raines East eight or nine days after the incident was similarly undocumented.

Chief Baker testified that they returned to the crime scene the morning after the robbery to search the building and adjacent fields; he said, however, that they did not attempt to collect fingerprints. He reiterated that in his opinion, it was "virtually impossible" to collect fingerprints from a surface that was previously wet. Chief Baker was not aware of Officer Burkeen's statement that the pack of Black and Milds was dry;

- 24 -

he stated that he was under the impression that they were found in the middle of the street and were wet. He noted that the TBI and the HCSO took over the case before the point at which laboratory testing was requested.

Chief Baker testified that he did not recall Tacyvin's name and that he did not interview him. When asked if it was common for a teenager to be brought to the police station in connection with a murder and not questioned, Chief Baker replied, "If somebody spoke to him and he was not perceived as somebody involved in the incident and he was released – I do not recall talking to Tacyvin Douglas." When asked if it would have been documented if "someone" spoke to Tacyvin briefly, Chief Baker responded,

> Maybe, if a statement was taken.
>
> . . . .
>
> Because if—just in a general conversation because if he was a juvenile taken from the high school to the police department and there was a statement being taken, then we would have to have a juvenile officer or a parent present. So that didn't take place because there's no documentation of that. Now, for Tacyvin to be there, maybe we had the wrong Douglas. I can't answer because I don't recall talking to a Tacyvin Douglas.

Chief Baker acknowledged that co-defendant Blakemore was a juvenile and that a juvenile officer was at the BPD that day for his interview.

On cross-examination, Chief Baker testified that after receiving the information from Mr. Barnes regarding Mr. Holmes's white Buick, officers waited for Mr. Holmes to leave school before conducting a traffic stop and bringing him to the police station. According to Chief Baker, Mr. Holmes "opened the whole case open" during his police interview. Chief Baker agreed that in Mr. Holmes's first interview, he indicated that he had picked up people "behind Jervis" and not that he was specifically at Raines East. He noted that another neighborhood was also in that area and that he consequently "didn't know to go get video footage at Raines East[.]" Chief Baker did not recall whether co-defendant Blakemore stated in his first police interview that he went to Raines East; however, he read from his handwritten notes about the interview that co-defendant Blakemore reported being picked up by Mr. Holmes from "behind Jervis." Chief Baker agreed that co-defendant Gray worked at El Ranchito and drove a white Buick.

On redirect examination, Chief Baker testified that Mr. Holmes used nonspecific language when referring to locations and directions. He noted that Mr. Holmes "knew a lot about other robberies, other things that were going on in Whiteville, Hornsby" and that

Mr. Holmes was not "totally aware of everything like surroundings and stuff[.]" Chief Baker was not aware that people in Bolivar generally referred to Raines East as "the apartments behind Jervis." He acknowledged the possibility that Mr. Holmes said in his police statement that he picked up co-defendant Blakemore from an apartment complex.

The State recalled Ms. Howell as a rebuttal witness. She testified that she kept time cards for her employees and that co-defendant Gray worked on Sunday, March 18, 2018, from 2:20 p.m. to 9:50 p.m. Ms. Howell stated that he drove a white Buick. She noted that Mr. Chaviriz was her brother and that he worked with co-defendant Gray at El Ranchito. She did not know why Mr. Chaviriz would approach an employee's car in the parking lot.

After the close of the evidence, the trial court instructed the jury, in relevant part, on identity, direct and circumstantial evidence, and accomplice testimony. The Defendant chose to present no closing argument. Upon this evidence, the jury convicted the Defendant as charged, and the trial court imposed a statutorily mandated life sentence on Count 2, first degree felony murder. After a sentencing hearing in which Ms. Howell and the victim's mother submitted victim impact statements, the State requested a minimum-length, concurrent sentence in Count 1, attempted aggravated robbery, with which the Defendant did not object. The trial court imposed the requested sentence without making further findings. After the motion for a new trial was denied, the Defendant timely appealed.

ANALYSIS

On appeal, the Defendant contends that (1) the evidence was insufficient to support his convictions because his involvement was based upon uncorroborated accomplice testimony and no direct evidence linked him to the offenses; (2) his right to confront a witness was violated when Agent Pugh referenced non-testifying co-defendant Robinson's statement and, relatedly, that the prosecutor committed misconduct by eliciting Agent Pugh's comments in this regard; and (3) his mandatory life sentence is unconstitutional in light of his status as a juvenile at the time of the offenses pursuant to Miller v. Alabama, 657 U.S. 460 (2012).

The State responds that the corroborating and circumstantial evidence were sufficient to establish the Defendant's participation in the robbery beyond a reasonable doubt. Relative to co-defendant Robinson's statement, the State argues that no prosecutorial misconduct occurred and that the trial court sustained a defense objection to the only reference made to co-defendant Robinson's identifying the Defendant as the shooter. Finally, the State argues that Miller is inapplicable to the Defendant's case because he received a life sentence, not life without the possibility of parole.

## I. Sufficiency

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference[.]" Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

- 27 -

"The identity of the perpetrator is an essential element of any crime." State v Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as a perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). Identity may be established by either direct evidence or circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793; see also State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010). The identification of the defendant as a perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

Relative to this case, first degree felony murder is defined as the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). Tennessee Code Annotated section 39-13-401 defines robbery as the intentional or knowing theft of property from the person of another by violence or putting the person in fear. A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103. As relevant to this case, robbery is elevated to aggravated robbery when it is "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-402.

Criminal attempt, as charged here, occurs when a person "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). To qualify as a "substantial step," the person's "entire course of action" must be "corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b).

As a preliminary matter, the Defendant argues that the evidence is insufficient because no direct evidence linked him to the crime. The Defendant's argument in this regard is without merit because our courts have previously held that identity can be established by circumstantial evidence alone. See Dorantes, 331 S.W.3d at 379-81.

The Defendant does not dispute that the evidence was sufficient to establish that an attempted robbery and felony murder occurred. Instead, he argues that codefendant Blakemore's accomplice testimony was the "sole[]" evidence of the Defendant's identity. The State responds that the Defendant's identity was circumstantially proven by Agent Pugh's testimony that the Defendant wrote with his left hand; the shooter's having used his left hand to pull the rifle trigger; the consistency between the Defendant's height and the FBI reconstruction of the shooter's height; the similarity between the pants worn by the

- 28 -

shooter in the El Ranchito recording and the Defendant's pants in the Shell station recording; and Jaquan's testimony that the Defendant and all three co-defendants came to his girlfriend's apartment after the shooting.

It is well-settled that in Tennessee, "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). An accomplice is one "who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." State v. Ballinger, 93 S.W.3d 881, 887 (Tenn. Crim. App. 2001). Whether there is sufficient corroboration is a determination for the jury. Shaw, 37 S.W.3d at 903.

Our supreme court has described what is required to establish sufficient corroboration as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

Shaw, 37 S.W.3d at 903 (quoting State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). The corroborative evidence need not be "overwhelming." Id. In fact, "[o]nly slight circumstances are required to corroborate an accomplice's testimony." State v. Griffis, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997).

In the light most favorable to the State, the evidence at trial established that co-defendant Robinson contacted co-defendant Blakemore and suggested that they commit a robbery. Co-defendant Gray picked up co-defendant Blakemore and drove him, co-defendant Robinson, and the Defendant to an area behind El Ranchito. Co-defendants Gray and Robinson stayed in the car because they were employees there and would be recognized. The surveillance recording showed two robbers—one taller with the rifle and black sweatpants with a white patch or stripe on the upper left thigh, and one shorter with a handgun and white tennis shoes. Co-defendant Blakemore identified himself as the shorter robber and the Defendant as the taller robber. The El Ranchito recording showed the taller man fired the rifle using his left hand on the trigger. Agent Pugh saw the Defendant sign a property receipt using his left hand. FBI Agent Imel's analysis of the

surveillance recording indicated that the shorter robber was five feet, eight or nine inches tall, and the taller robber was about six feet tall.  According to their booking photographs, co-defendant Blakemore was just taller than five feet, eight inches, and the Defendant was six feet tall.

In addition, shortly after the robbery, the Shell surveillance cameras showed the Defendant with co-defendant Blakemore in Mr. Holmes's car.  The quality of the video was low, but it was clear that the Defendant's pants at the gas station also had a white patch or stripe on the upper left thigh.  We note that the Defendant did not contest that he was with Mr. Holmes and co-defendant Blakemore at the Shell station, although defense counsel's questioning advanced the theory that the Defendant was not involved with the robbery and that Mr. Holmes picked him up separately from co-defendant Blakemore.  Co-defendant Blakemore claimed only to know the Defendant as an acquaintance, but Agent Pugh's investigation reflected that the Defendant, who was formerly a Vice Lord, continued to spend time with the three co-defendants frequently, two of whom were current Vice Lord members.

We conclude that sufficient evidence corroborated the Defendant's identity such to support his convictions.  See Griffis, 964 S.W.2d at 589.  Specifically, the Defendant's left-handedness, height, the white-striped pants visible in the El Ranchito and Shell surveillance recordings, and his friendship with the co-defendants circumstantially established that he was the taller robber who shot the victim inside El Ranchito.  The Defendant is not entitled to relief on this basis.

## II.  Confrontation

The Defendant contends that his right to confront witnesses was violated when Agent Pugh testified that co-defendant Robinson's police statement was consistent with that of co-defendant Blakemore.  The Defendant noted during oral argument and in his reply brief that this topic was broached three times during Agent Pugh's testimony.[14]  The State responds that no confrontation rights were implicated because Agent Pugh did not verbatim recount anything co-defendant Robinson said during his police interview.

As a preliminary matter, we note that the Defendant alleged for the first time in his reply brief that prosecutorial misconduct occurred when the State asked Agent Pugh about co-defendant Robinson's interview.  He repeated this argument during oral argument.  The Defendant argues that the prosecutor acted in contravention of an unspecified pretrial ruling prohibiting introduction of co-defendant Robinson's statement.  Because no claim of prosecutorial misconduct was raised at trial, in the motion for new trial, or the appellant's

---

[14] The record reflects that Agent Pugh only mentioned co-defendant Robinson's statement twice.

initial brief, this issue has been waived.  See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.")

In addition, we note that the Defendant has not included in the record on appeal any motions,[15] orders, or transcripts of pretrial hearings relevant to the exclusion of co-defendant Robinson's statement.  The Defendant bears the burden of preparing an adequate record on appeal, including transcripts of all parts of the proceedings "necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal."  Tenn. R. App. P. 24(b); see Timothy A. Baxter v. State, No. W2019-00590-CCA-R3-CD, 2020 WL 41926, at *2 (Tenn. Crim. App. Jan. 3, 2020) (citing State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993), no perm. app. filed.  Finally, the reply brief does not set out the applicable law or standard of review for prosecutorial misconduct issues.  See Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief "shall contain" an argument including "citations to the authorities . . . relied on" and "a concise statement of the applicable standard of review").

Turning to the Defendant's hearsay allegations, we note that generally, decisions regarding the admission of evidence are left to the sound discretion of the trial court.  State v. Saylor, 117 S.W.3d 239, 247 (Tenn. 2003).  "[T]rial courts are generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion."  Id.

Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Rule 802 provides that hearsay is not admissible except as allowed by the rules of evidence or other applicable law.   As explained by one treatise, hearsay can occur in the absence of a direct quote of an out-of-court statement:

> [W]itnesses . . . are tempted by lawyers to get in hearsay through the back door.
>
> > Q: After talking to the informant – and don't tell the jury what the informant told you – what did you do?
> >
> > A:  I went to the luggage room, found the red suitcase with the defendant's name on it, and found cocaine inside.

---

[15] One pretrial motion in the record requested the State to provide copies of any statements by the co-defendants, but no response or order related to the motion was included.

Most jurors will get the message intended from this indirect hearsay. They will have learned what the informant said, even though no words from the informant were actually repeated. The testimony is hearsay and inadmissible[.]

Neil P. Cohen et al., Tennessee Law of Evidence, § 8.01[11][b] (6th ed. 2011).

Our supreme court has recounted that the rule announced by the United States Supreme Court in Bruton v. United States, 321 U.S. 193 (1968), "proscribes, generally, the use of one co-defendant's confession to implicate the other as being violative of the nonconfess[ing] co-defendant's Sixth Amendment right of confrontation." State v. Elliot, 524 S.W.2d 473, 477 (Tenn. 1975). Moreover, in Crawford v. Washington, 541 U.S. 36 (2004), the United States Supreme Court held that testimonial hearsay statements violate a defendant's confrontation rights and are only admissible when (1) the declarant is unavailable and (2) the defendant has had a prior opportunity to cross-examine the declarant. 541 U.S. at 68-69; see also State v. Maclin, 183 S.W.3d 335, 345 (Tenn. 2006), abrogated by State v. Cannon, 254 S.W.3d 287 (Tenn. 2008). When hearsay is non-testimonial, the Tennessee Rules of Evidence govern its admissibility. State v. Franklin, 308 S.W.3d 799, 810 (Tenn. 2010). Non-hearsay statements— i.e., statements not admitted for the truth of the matter asserted—do not violate the Confrontation Clause, whether or not the statements are testimonial. Id. "Whether the admission of hearsay statements violated a defendant's confrontation rights is . . . a pure question of law" that we review de novo. Franklin, 308 S.W.3d at 809.

Here, although Agent Pugh testified before co-defendant Blakemore, the substance of co-defendant Blakemore's police statement had been introduced in detail through Chief Baker, Officer Swift, Officer Burkeen, and Agent Pugh. We note that defense counsel elicited some of this testimony during cross-examination.

During the State's direct examination of Agent Pugh, he clarified an answer to a previous question by stating that he did not personally interview co-defendant Blakemore, but did interview co-defendant Robinson. When the prosecutor began to ask a question comparing co-defendant Robinson's interview to co-defendant Blakemore's interview, the Defendant objected on confrontation grounds, as it was not anticipated that co-defendant Robinson would testify. The prosecutor responded that he only sought to inquire about whether the statements were consistent. The trial court instructed the prosecutor to rephrase the question to ask whether the statements were consistent, and Agent Pugh replied that they were "[e]xtremely consistent." Later, the State asked Agent Pugh how he corroborated co-defendant Blakemore's identification of the shooter. Agent Pugh began to reply that co-defendant Robinson's interview corroborated it, upon which the

Defendant's second confrontation objection was sustained. However, the trial court gave the jury no instruction to disregard the answer.

We disagree with the State's assertion that no confrontation violation can occur so long as a witness does not directly quote a non-testifying co-defendant's statement. See, e.g., State v. Robert Spencer, No. W2014-02454-CCA-R3-CD, 2016 WL 325460, at *4 (Tenn. Crim. App. Jan. 27, 2016) (concluding that a police witness's testimony that the defendant matched descriptions provided by a "cooperating source" was hearsay). Were this the case, the right to confrontation would be rendered a nullity—the State would only need to produce one credible witness and a slew of police witnesses to opine that other witnesses' accounts were consistent without affording the Defendant an opportunity to cross-examine the witnesses and establish their credibility, or lack thereof.

In this case, Agent Pugh's assertion that the two police statements were consistent was hearsay. Co-defendant Blakemore's statement had been recounted several times by the time Agent Pugh testified. Although Agent Pugh did not repeat co-defendant Robinson's words, he established by implication that co-defendant Robinson made the same statements as co-defendant Blakemore. The fact that no quoted language was presented to the jury draws a distinction without a difference because the facts to which Agent Pugh referred were clear.

Putting aside any issues of improper bolstering in advance of co-defendant Blakemore's testimony, Agent Pugh's testimony was substantive evidence of corroborating facts offered for the truth of the matter asserted. Co-defendant Robinson's "consistent" description of the robbery and the shooter's identity was irrelevant if it was not true. The content of co-defendant Robinson's interview, particularly his identification of the Defendant as the shooter, was not admissible pursuant to any hearsay exception; therefore, the evidence was inadmissible hearsay. Relative to confrontation, co-defendant Robinson's police statement was testimonial in nature, and the Defendant's right to confrontation was violated in this regard.

When, as here, a defendant's right to confrontation has been violated, we must determine the error's effect. Our supreme court "has recognized three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). A confrontation violation is a nonstructural constitutional error. State v. Gomez, 163 S.W.3d 632, 648 (Tenn. 2005), overruled on other grounds by State v. Gomez, 239 S.W.3d 733 (Tenn. 2007). As such, the Defendant is "entitled to a new trial unless we are convinced beyond a reasonable doubt, and on the basis of the entire record, that this error did not contribute to the jury's verdicts." State v. Bell, 512 S.W.3d 167, 192 (Tenn. 2015). The State bears the burden of

proving that a nonstructural constitutional error was harmless beyond a reasonable doubt. See State v. Brown, 311 S.W.3d 422, 434 (Tenn. 2010).

After considering the contents of the record, the evidence at trial, the Defendant's theory of defense, and the jury's verdict, we are constrained to conclude that the erroneous references to co-defendant Robinson's statement were harmless. See State v. Banks, 271 S.W.3d 90, 126 (Tenn. 2008) ("When undertaking a harmless error analysis . . . the reviewing court 'should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury.'") (quoting State v. Allen, 69 S.W.3d 181, 191 (Tenn. 2002)). The Defendant's defense theory was to highlight the poorly-conducted BPD investigation, diminish co-defendant Blakemore's credibility, and cast blame on Tacyvin Douglas as the true perpetrator. Although we acknowledge that Agent Pugh's improper references to co-defendant Robinson's police statement were relevant to the crucial question of identity, as we stated above, the evidence of identity was sufficient to support the Defendant's convictions. The Defendant's identity as the shooter was established by co-defendant Blakemore's testimony and adequately corroborated by the matching pants the Defendant wore in the El Ranchito and Shell station recordings, the Defendant's left-handedness, his height, his presence with co-defendant Blakemore at Jaquan's apartment and in Mr. Holmes's car after the shooting, and his known friendship with the co-defendants. In light of the evidence of the Defendant's guilt and the brevity of the two references to co-defendant Robinson's interview, this error was harmless beyond a reasonable doubt. The Defendant is not entitled to relief on this basis.

### III.    Sentence

The Defendant contends that his mandatory life sentence is unconstitutional because he was a juvenile when he committed the offenses. He argues that Tennessee's sentencing laws, which mandate that an offender serve at least fifty-one years of a life sentence before becoming eligible for parole, violate the United States Supreme Court's previous holdings that juvenile offenders are entitled to a "meaningful chance for release" due to the special considerations attendant to youth and the potential for rehabilitation. The State responds that because the Defendant was not sentenced to life without the possibility of parole, this line of Supreme Court jurisprudence does not apply.

In Miller, the United States Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" 567 U.S. at 465. The Court did not prohibit a sentence of life without parole for all juveniles convicted of murder. Id. at 479. Rather, the sentencer must consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Id. A judge or jury

must have the opportunity to consider mitigating circumstances before sentencing a juvenile to life without parole. Id. at 489. In 2016, the Court held that Miller applied retroactively. Montgomery v. Louisiana, 577 U.S. 190 (2016) (as revised Jan. 27, 2016). In Montgomery, the Court discussed Miller's holding as follows: "Although Miller did not foreclose a sentencer's ability to impose life without parole on a juvenile, the Court explained that a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect 'irreparable corruption.'" Id. at 195 (quoting Miller, 567 U.S at 479 (quoting Roper v. Simmons, 543 U.S. 551, 573 (2005) (holding that death sentences for juvenile offenders violated the Eighth Amendment))).

The Defendant argued forcefully at oral argument that the Court's recent opinion in Jones v. Mississippi, 141 S.Ct. 1307 (2021), further rendered the application of a fifty-one-year life sentence to a juvenile unconstitutional, stating that Justice Kavanaugh wrote for the majority that "if there's no finding of permanent incorrigibility . . . the court must have the discretion to sentence [a juvenile defendant] to less than life imprisonment, or it's a violation of the Eighth Amendment." However, this interpretation of Jones is not consistent with its plain language. In the majority opinion, the Court deemed "a State's discretionary sentencing system . . . both constitutionally necessary and constitutionally sufficient" to satisfy Miller in cases when a juvenile commits a homicide and is subsequently sentenced to life without the possibility of parole. Id. at 1313. The Court specifically rejected the defendant's argument that to impose a sentence of life without parole, the sentencer must also make an explicit or implied factual finding of "permanent incorrigibility." Id. Significantly, we note that Jones, like Miller and Montgomery, does not address life sentences with the possibility of parole.

Tennessee Code Annotated sections 39-13-202(b) and 39-13-207 state that a juvenile convicted of first degree murder may be sentenced to either life or life without the possibility of parole. In this case, State did not seek a sentence of life without the possibility of parole, and the Defendant was sentenced to life.

This court has repeatedly declined to apply Miller outside the context of mandatory life without parole sentences. See, e.g., State v. Steven King, No. W2019-01796-CCA-R3-CD, 2020 WL 5352154, at *2 (Tenn. Crim. App. Sept. 4, 2020) (declining to apply Miller to an aggregate sentence that "may push, and possibly exceed, the bounds of" that defendant's life expectancy because he was not sentenced to life without the possibility of parole), perm. app. denied (Tenn. Jan. 14, 2021); Charles Everett Lowe-Kelly v. State, No. M2015-00138-CCA-R3-PC, 2016 WL 742180, at *1 (Tenn. Crim. App. Feb. 24, 2016) (concluding that Miller did not apply to the petitioner, who committed offenses as a minor, because he did not receive a life without parole sentence. The petitioner received two consecutive life sentences served concurrently with nine fifteen-year sentences). In

accordance with this jurisprudence, we are not prepared to expand the parameters of the Eighth Amendment in this regard.

We wish to note that we have considered the Defendant's policy arguments regarding the particular length of Tennessee's life sentences, as well as the special considerations applicable to juvenile offenders and their potential for rehabilitation. However, as stated above, the province of this court is to apply the law as it has been enacted by our legislature and interpreted by our courts. The Defendant is not entitled to relief on this basis.

## CONCLUSION

After consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE